**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **ALAMO BIOLOGICS LLC** | § | **CASE NO. 26-51549-ALT** |
| | § | **(Chapter 11)** |
| **Debtor** | § | |

**DEBTOR'S EMERGENCY APPLICATION FOR AUTHORIZATION TO PAY PREPETITION CLAIMS OF CRITICAL VENDORS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Now Comes Alamo Biologics LLC ("Debtor") and moves this Court pursuant to Sections 105, 363, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for the entry of an order authorizing the Debtor to pay all or a portion of the prepetition claims of certain Critical Vendors (as defined below), and in support the Debtor states as follows:

RELIEF REQUESTED

1. Debtors request that the Court grant it authorization to pay the pre-petition claims of critical vendors as listed on Exhibit "A" attached hereto

JURISDICTION

2. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This Court may hear and determine this Motion under the standing order of reference issued by the United States District Court for the Western District of Texas under 28 U.S.C. § 157. Consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b). Venue of this proceeding is proper in this district under 28 U.S.C. §§ 1408 and 1409.

BACKGROUND

3. On June 3 2026, Debtor filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Since that time, Debtor has operated its businesses as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. No creditors' committee has been appointed in this case by the United States Trustee. Further, no trustee or examiner has been requested or appointed. The Debtor is a privately owned Texas limited liability company. Debtor is a full service tissue bank offering high quality allografts and biologics. Debtor's services include: research and development, contract manufacturing, and storage

EXHIBIT
A

facilities. Debtor distributes to medical facilities and distributors on world-wide basis. In order to provide these services, it is necessary for the Debtor to utilize tissue recovery vendors and other highly specialized regulated vendors of biologic material. Debtor also often requires the services of specialized sales professionals many of whom are considered 1099 independent contractors.

4. The Debtor believes that the relief sought herein is not only critical to the Debtor's reorganization efforts, but immediately necessary in light of the nature of the Debtor's operations. If the requested relief is not granted and certain critical vendors refuse to continue to supply goods or services to the Debtor post-petition, the Debtor may be unable to continue its operations and keep its customers satisfied, which will certainly endanger the Debtor's successful reorganization and substantially harm all creditors. The Debtor has determined that replacing these critical vendors would be disruptive, cost-prohibitive, and in certain instances, impossible.

## BASIS FOR RELIEF REQUESTED

5. Section 105(a) of the Bankruptcy Code provides: The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process. This section provides bankruptcy courts with broad authority and discretion to enforce the provisions of the Bankruptcy Code either under specific statutory fiat or equitable common law principles.

6. "The ability of a Bankruptcy Court to authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc*., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). This equitable common law principle "was first articulated by the United States Supreme Court in *Miltenberger v. Logansport, C. & S. R. Co*., 106 U.S. 286 (1882) and is commonly referred to as either the 'doctrine of necessity' or the 'necessity of payment' rule." Id. At 175-76. Under the doctrine of necessity, a bankruptcy court may exercise its equitable power to authorize a debtor to pay certain critical prepetition claims, even though such payment is not explicitly authorized under the Bankruptcy Code. In *In re Structurelite Plastics Corp*. 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988), the bankruptcy court stated that "a bankruptcy court may exercise its equity powers under § 105(a) to authorize payment of pre-petition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately." *ID.*

7. If the attached critical vendor claims are not satisfied, the Debtors will most likely suffer irreparable damage to its client relationships. Of critical importance is Debtor's ability to provide its products to customers which requires the purchase of tissue and other biologic materials from the critical vendors listed on Exhibit A. Additionally, payment of the pre-petition claims of the independent contractors is necessary in order for the Debtor to provide its services to its customers. Without doing so, Debtor's business operations will come to a halt.

8. Based upon the foregoing, the Debtors submit that the relief requested herein is essential, appropriate, and in the best interests of the Debtors' estates and all parties in interest. Allowing the Debtor to pay the Critical Vendor Claims, pursuant to all or some of the above-referenced provisions, is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going concern value and maximizing the value of property available to satisfy creditors. *See Bank of Am. Nat'l Trust & Says. Assoc. v. 203 N LaSalle St. P'Ship,* 526 U.S. 434, 453 (1999). The Debtor respectfully submits that similar relief is warranted in this Chapter 11 case because without the goods and services provided by the Critical Vendors, the Debtor could not continue in an uninterrupted manner to operate its business or progress towards a successful reorganization.

**BANKRUPTCY RULE 6003 SATISFIED AND REQUEST FOR WAIVER OF STAY**

9. The Debtor further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor, Fed. R. Bankr. P. 6003 has been satisfied and the relief requested should be granted. Federal Rule of Bankruptcy Procedure 6003 provides: Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 20 days after the filing of the petition, grant relief regarding the following: . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001.

10. The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Fed. R. Bankr. P. 6004(h), "[an] order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the relief requested here is essential to prevent irreparable damage to the Debtor's operations, going-concern value, and its efforts to pursue a sale or restructuring of its assets and liabilities. Accordingly, the relief requested is appropriate under the circumstances and under Fed. R. Bankr. P. 6003 and 6004(h).

WHEREFORE, the Debtors respectfully request that this Court enter an order authorizing payment of the critical vendors as attached on Exhibit "A", and granting such other and further relief, legal or equitable, special or general to which they may show themselves justly entitled.

Respectfully submitted,

Villa & White LLP

By: *__/s/ Morris E. "Trey" White III*____________

Morris E. "Trey" White III
State Bar No. 24003162
100 NE Loop 410 #615
San Antonio, Texas 78216
(210) 225-4500 Telephone
(210) 212-4649 Fax
ATTORNEY FOR DEBTOR

**CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2026, a true and correct copy of the above and foregoing document was served on the parties listed on the attached creditor's matrix pursuant to Bankruptcy Rule 9013.

__/s/ *Morris E. "Trey" White III*____________
Morris E. "Trey" White III

**Alamo Biologics LLC Critical Vendor List** **Exhbit A**

| Name | Open balance | |
|---|---|---|
| Total for Bauer, Michael J., MD | $16,500.00 | Debtor seeks authority to pay $16,500.00 in accrued pre-petition professional fees owed to their Medical Director, Dr. Bauer, for services rendered across March, April, and May. Dr. Bauer’s engagement is a mandatory requirement under FDA regulations to oversee donor eligibility determinations and approve donor charts. Additionally, we rely directly on Dr. Bauer's medical license to purchase necessary, restricted medical supplies. If Dr. Bauer’s services or license were withheld due to unpaid pre-petition arrears, the Debtors would be legally and operationally prohibited from procuring processing supplies and releasing finished tissue products, causing an immediate cessation of all business activity and top-line revenue |
| Total for BioCut Systems | $3,349.59 | This critical vendor provides specialized preventive maintenance kits and custom replacement blades for the Manufacturing Biocut bandsaws. Because these maintenance components and blades are proprietary to this machinery and cannot be sourced elsewhere, there are no viable market alternatives. Maintaining continuous access to these sole-source supplies is vital to prevent mechanical failure, ensure continuous tissue sectioning operations, and protect top-line revenue for the company |
| Total for CRYO-1 | $4,600.00 | Core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.<br><br>Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue |
| Total for Danco Medical, Inc. | $158,915.00 | These are commissions due a sales representative based on invoices customers have paid |
| Total for DCIDS Tissue Services | $5,500.00 | Core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.<br><br>Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue |

| | | |
|---|---|---|
| **Total for Instant Systems** | **$12,352.47** | **The Osteolok package purchased from Instant Systems is a fully validated packaging system critical for distribution of costal cartilage to South Korea (lauched in July 2026). Transitioning to a new packaging vendor would require a complete revalidation, consuming significant time and capital. Crucially, this same system serves as the baseline for two high-priority new product development projects: Cortical Dowel and Mini Patches. Requiring a revalidation cycle would inevitably push back launch dates for both products, leading to a direct and measurable impact on top-line revenue.** |
| **Total for Life Center Organ Donor Network** | **$4,000.00** | **Core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.**<br><br>**Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue** |
| **Total for LifeCenter NW** | **$309,393.07** | **Core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.**<br><br>**Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue** |
| **Total for Lifecycle Biotechnologies, LP** | **$14,948.00** | **This approved vendor is single-source critical to our tissue processing operations, providing custom-made sterile reagents. Onboarding a new vendor would demand significant capital and time for necessary supplier qualification and validation. Failing to complete this before existing stock is exhausted would result in a total halt of all manufacturing activities. Furthermore, this supplier provides cost-effective manufacturing, holds inventory by the pallet based on our forecasts, and operates out of Texas, saving substantial freight costs compared to higher-priced competitors. Prepayment prior to shipping is currently required to maintain supply during the pre-petition debt resolution.** |

| | | |
|---|---|---|
| **Total for Lifesharing** | **$65,550.00** | **core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.<br><br>Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue** |
| **Total for Louisiana Organ Procurement Agency** | **$111,513.75** | **This is a Recovery Partner, core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.<br><br>Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue** |
| **Total for Linde** | **$7,528.69** | **This contracted vendor supplies $CO_2$ for tissue cleaning and sterilization, as well as dry ice for internal transit and customer shipping. Because these consumables are utilized across all tissue processing without exception, maintaining a cost-effective supply is critical. While substitute local vendors exist, their higher price structures would directly increase baseline manufacturing costs across the entire enterprise, immediately eroding net revenue and harming the company. Securing this vendor's continued services under current pricing terms is essential to preserving operational margins** |
| **Total for medmix** | **$29,019.00** | **This supplier constitutes a sole-source, mission-critical vendor for ongoing operations. The vendor manufactures a specialized, high-quality open-bore syringe system that is uniquely designed and essential for the delivery of the DBM Putty product line. Adoption of this specific syringe was executed as a mandatory Corrective and Preventive Action (CAPA)—fully documented within the Quality Management System—to remediate historical customer complaints and regulatory compliance concerns.<br>Consequently, reverting to the former supplier based in India is legally, operationally, and regulatorily impermissible. Any disruption in supply from this vendor would immediately halt production and distribution of the DBM Putty line, causing immediate and irreparable harm to product delivery, regulatory compliance standing, and top-line sales revenue<br><br>This is an approved vendor who supplies a sterile syringe used for storing and dispening bone putty. The only other vendor who provides an open bore syringe is located in India. They will require pre-payment for any further orders unless we pay our pre-petition debt. Our current pricing with them is based on a Purchase order for supplying a year's worth of syringes.** |

| | | |
|---|---|---|
| **Total for Mississippi Organ Recovery Agency** | **$214,950.00** | **This is a Recovery Partner, core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.<br><br>Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue** |
| **Total for MTF Biologics** | **$1,449,414.07** | **This is a Recovery Partner, core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.<br><br>Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue** |
| **Total for Nelson Laboratories, Inc.** | **$6,063.75** | **This critical contract laboratory, which provides regulatory-mandated sterility and microbiological testing for finished tissue lines. Although alternative laboratories exist, transitioning to a new facility would incur significant costs and extended operational delays to perform required regulatory validations, including Method Suitability testing under FDA and ISO 11137 requirements. The delay inherent in re-validating a new laboratory would freeze finished inventory releases, directly impacting top-line sales revenue and liquidity. Continuing this relationship avoids unnecessary validation expenses and guarantees uninterrupted product distribution<br><br>This vendor is requiring we pay each invoice prior to releasing test results because of our outstanding pre-petition debt.** |
| **Total for Network for Hope, Inc** | **$10,000.00** | **This is a Recovery Partner, core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.<br><br>Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue** |

| | | |
|---|---|---|
| **Total for Nevada Donor Network** | **$363,936.84** | **This is a Recovery Partner, core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.<br><br>Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue** |
| **Total for NovaSterilis, Inc.** | **$5,162.00** | **Manufacturing relies entirely on this sole-source vendor for their proprietary supercritical CO2 tissue sterilization infrastructure. The vendor manufactures the specialized submarine-grade steel pressure vessels, supplies the required single-use sterilization pouches and replacement parts, and serves as the sole market entity qualified to service the high-pressure gas system. Because no alternative suppliers or service providers exist in the industry, maintaining continuous access to this vendor's parts and specialized maintenance services is vital. Any disruption would immediately paralyze the our sterilization capabilities, halting product delivery and directly impacting revenue.** |
| **Total for Prudential Cleanroom Services** | **$2,509.57** | **This vendor provides and launders specialized, custom-labeled cleanroom PPE specifically assembled for the Alamo facility's processing and sterile supply technicians. Transitioning to a alternative vendor would require significant time and capital while creating immediate risk to cleanroom operations. Additionally, ending the contract prematurely would trigger substantial financial penalties and inventory return fees. Preserving this vendor relationship preserves liquidity, avoids severe contractual liabilities, and ensures continuous cleanroom processing** |
| **Total for Qualtex Laboratories** | **$46,381.12** | **Key, approved laboratory for processing tests media plates for environmental monitoring and residual moisture testing. They also perform tests on culture swabs for donors sent to us that were not swabbed when the donor was procured. They are requiring payment whithin five days of billing us to continue providing services. This term will be changed back to 30 days once we pay the pre-petition debt.<br><br>This critical contract laboratory, which provides regulatory-mandated environmental, and residual moisture testing for finished tissue lines. Although alternative laboratories exist, transitioning to a new facility would incur extended operational delays to perform required regulatory validations. The delay inherent in re-validating a new laboratory would freeze finished inventory releases, directly impacting top-line sales revenue and liquidity. Continuing this relationship avoids unnecessary validation expenses and guarantees uninterrupted product distribution** |

| | | |
|---|---|---|
| **Total for Regenerative Biologics, Inc.** | **$546,958.59** | **This is a Recovery Partner, core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.<br><br>Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue** |
| **Total for SD Lions Eye Bank** | **$454,680.00** | **This is a Recovery Partner, core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.<br><br>Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue** |
| **Total for South Texas Blood & Tissue Center** | **$464,388.91** | **This is a Recovery Partner, core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.<br><br>Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue** |

| | | |
|---|---|---|
| **Total for Southern Legacy of Life** | **$157,950.00** | **This is a Recovery Partner, core operations depend entirely on the steady supply of human donor tissue provided by this essential recovery partner. Pursuant to strict Food and Drug Administration (FDA) regulations and the our internal Quality Management System (QMS), all tissue recovery agencies must undergo an extensive qualification and approval process before entering the supply chain. Onboarding a replacement agency requires a lengthy six- to nine-month lead time before the first donor tissue can even be received.<br><br>Furthermore, donor allocation across recovery partners is strictly governed by binding, long-term agreements with limited supply capacity that cannot be expanded or adjusted on short notice. Disruption of this specific relationship would immediately choke the our raw material pipeline, forcing an operational standstill, jeopardizing customer fulfillment, and causing severe, irreparable harm to the value of the estates and top-line revenue** |
| **Total for STERIS Isomedix Operations, Inc.** | **$10,434.84** | **This vendor provides essential gamma irradiation sterilization for finished tissue products. Although alternative irradiation providers exist, engaging a new supplier requires extensive regulatory auditing, supplier qualification, and formal sterilization validation under FDA and QMS protocols. Sourcing a new vendor would force an immediate halt to product sterilization during the validation period, directly freezing finished inventory distribution and severely impacting company revenue. Maintaining this approved vendor ensures uninterrupted regulatory compliance and continuous revenue generation.** |
| **Total for Tavatek** | **$1,366.20** | **Manufacturiing relies on this approved vendor to design and supply custom tooling for CNC machines that were specifically configured by this vendor for use in cleanroom environments. Given the proprietary technical setup and specialized cleanroom integration, transitioning to an alternative supplier would cause substantial operational downtime, force costly re-engineering, and risk cleanroom compliance failures. Maintaining this vendor is essential to sustaining CNC processing capacity and protecting net revenues for the company.** |
| **Total Amount Payable Critical Vendors** | **$4,477,365.46** | |